591 So.2d 423 (1991)
Ola Mae SPINKS, Plaintiff-Appellant,
v.
LOUISIANA DEPARTMENT OF HEALTH & HUMAN RESOURCES, Defendant-Appellee.
No. 90-741.
Court of Appeal of Louisiana, Third Circuit.
December 18, 1991.
Rehearing Denied January 29, 1992.
Writ Granted in Part with Order Denied in Part April 3, 1992.
*424 Fuhrer, Flournoy, Hunter & Morton, George Flournoy, Alexandria, for plaintiff-appellant.
Stafford, Stewart & Potter, Kay Michiels, Alexandria, for defendant-appellee.
Before LABORDE, YELVERTON and KNOLL, JJ.
YELVERTON, Judge.
This appeal arises from a worker's compensation claim brought by Ola Mae Spinks' against her employer, the Louisiana Department of Health and Human Resources (DHHR). The trial court determined that Mrs. Spinks' had a heart attack in the course of her employment, but that it did not arise out of her employment, and denied benefits. We reverse.
At the time of her attack Ola Mae Spinks, 54, had been employed for over 11 years by Pinecrest State School, a DHHR facility, located in Pineville, Louisiana. Pinecrest State School houses mentally and physically handicapped persons. Spinks worked the night shift, 10 p.m. to 6 a.m., five nights a week as a Resident Training Specialist in charge of a cottage housing 24 adult female residents. Although the residents of this cottage were not as bad off as some others, they were all mentally and physically handicapped, and there were several problem cases. Three were confined to wheelchairs. One wheelchair patient, a spastic, required physical assistance.
Spinks' duties, as described by her supervisor, were to "supervise two or more direct care personnel and coordinate/supervise the care of 24 mentally retarded mostly geriatric and handicapped residents." The supervisor further described the residents as including "... 3 wheelchairs 3 with severe gait problems, several seizure patients." Following Spinks' heart attack, her supervisor said that she: "[c]annot lift the wheelchair patients in and out of bathtub, chair, etc.; cannot lift wet laundry, carry dirty linen sacks, required to mop all floors nightly which is usually divided into three 45 minute seesions [sic] of mopping, lift and clean bottom of 48 training chairs/legs of tables, handle disturbed, combative, or seizure patients that require exertion."
Pinecrest rules required that Spinks be provided with two assistants. However, on the night of her heart attack, she had none. One assistant had the night off, and the other was moved to another cottage immediately after Spinks arrived, leaving her alone to care for the 24 residents.
Although she had chest pains a few times during the week before the heart attack, Spinks felt fine when she reported to work at 9:45 p.m. on April 7, 1987. She made her rounds. She could not remember whether or not she mopped the kitchen floor. She thought she did. She remembered cleaning the backs of 24 chairs, and putting the days washing of wet towels and washrags used by the 24 patients on to wash. She also took Martha Costa, the spastic wheelchair patient, to the bathroom. This patient weighed 160-180 pounds. Spinks had to lift her from the bed onto the wheelchair, from the wheelchair to the commode, and then accomplish the same *425 lifts in reverse, commode to wheelchair, wheelchair to bed.
Sometime before 11:00 p.m., Spinks became clammy and nauseated, and experienced stabbing chest pains and shortness of breath. She called Barbara Rush, her supervisor, who called Spinks' husband, Earnest. Earnest picked her up soon afterwards and took her to Huey Long Hospital where she received a shot and was released. She went home but at about 4:30 a.m., Earnest called Dr. Kenneth T. Johnson and took Spinks to Rapides General Hospital. Myocardial infarction was diagnosed and Dr. P.K. Kaimal was called in by Dr. Johnson. Dr. Kaimal performed a balloon angioplasty and opened a main artery that had 100% blockage. This saved her life. She remained hospitalized for eight days. Following a period of recuperation, Dr. Johnson allowed her to return to work with restrictions, but two attempts were unsuccessful. She has not worked since the heart attack.
Spinks received worker's compensation from April 8, 1987, which was the next day after her heart attack, through January 16, 1989. Benefits were terminated January 17, 1989, at the direction of the Claims Council in Baton Rouge. The record does not tell us the reason why the council made the determination to stop benefits. Spinks brought this suit.

"Arising out of" employment
The trial court dismissed the suit following trial. In reasons for judgment the court stated that whether or not the stress or strain of the work precipitated the heart attack was "not abundantly clear." Presupposing that it was, however, the trial court rested its decision on a finding that the stress or strain at work was not greater than that experienced in non-employment life. The court made no credibility determination. The trial court determined that the
... physical exertion, stress and strain connected with Mrs. Spinks' employment activities were no greater than those generated in her everyday non-employment life. The washing and mopping she was required to do in her job was no greater than her housekeeping at home. As for assisting the wheelchair bound resident, the court is of the opinion that this is no more strenuous than moving furniture or going out dancing.
We find clear error. The evidence points unmistakably to a finding that Spinks had a heart attack on the job, that it was related to her employment activities, and that it caused her disability.
At the time of her heart attack Spinks was working the night shift. She slept at home during the daytime. Most of the housework at her home was done by her daughter. Even so, the housekeeping for 24 adult residents in the cottage can hardly be compared to that required for the three occupants of Spinks' home, namely herself, her husband, and her daughter. Spinks testified only that she could move furniture. She never said that she did, much less that it was routine non-employment activity. She also enjoyed walking and dancing with her husband for entertainment. This activity cannot be equated with assisting the 160-180 pound invalid, Martha Costa, to and from the bathroom.
During the short time that she was at work on the night of her heart attack, Spinks moved some chairs, put a load of wet towels and washcloths in the washing machine, and took Martha to the bathroom. Her chest pains began immediately afterward. Her supervisor came and sat with her while she waited for her husband to pick her up. There is no question that she had a heart attack that night.
Only two doctors testified, and they both related her work activities to her heart attack. Dr. Kenneth Johnson, a family medicine doctor, testified on January 9, 1990, by deposition. He stated that as of that date Mrs. Spinks could not return to the job she was doing before her heart attack. His opinion was based on the job description of her position. He said that if she had been performing some of the work duties as outlined in the job description, that was a type of physical stress which could have precipitated the heart attack.
*426 Dr. P.K. Kaimal, a board certified cardiologist, testified that she had a heart attack on the job, and that if she had been engaged in any heavy physical exertion, such as pushing or pulling or lifting, that could have been a precipitating factor to the heart attack. The stress of having to be in the cottage alone, having to take care of 24 disabled people by herself, could also have been a precipitating stressful factor. Dr. Kaimal's deposition was taken on January 10, 1990, and he stated then that his opinion had never changed, she should not even try to go back to any kind of work which involved physical or psychological exertion. He testified that Mrs. Spinks told him that she handled a lot of mentally retarded people, some adult sized and some violent, and that this was a very upsetting thing for her. He said that this alone could be stressful enough to cause a heart attack. He stated that in his opinion more likely than not her work activity that night played a part in causing the heart attack.
The law on this subject has recently been set forth in the Supreme Court decision of Tucker v. Pony Exp. Courier Corp., 562 So.2d 897 (La.1990), at page 900:
A deficient employee with a weakened heart who is vulnerable to very slight strain or exertion has been protected by the Louisiana Compensation Statutes. Behan v. John B. Honor Co., 143 La. 348, 78 So. 589 (1918), Roussel v. Colonial Sugars Company, 318 So.2d 37 (La. 1975), Carruthers v. PPG Industries, Inc., 551 So.2d 1282 (La.1989). A claimant need not prove that his heart accident is caused solely by his employment if the work is shown to be a contributing, accelerating or aggravating factor. Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625 (1946); McDonald v. Intern. Paper Co., 406 So.2d 582 (La. 1981); Guidry v. Sline Industrial Painters, Inc., 418 So.2d 626 (La.1982); Reid v. Gamb, Inc., 509 So.2d 995 (La. 1987).
Disabling heart-related pain suffered by an employee at work has been recognized as a compensable accident. Ferguson v. HDE, Inc., 270 So.2d 867 (La. 1972); Adams v. New Orleans Public Service, Inc., 418 So.2d 485 (La.1982); Woolsey v. Cotton Bros. Bakery Co., Inc., 535 So.2d 1119 (La.App. 2d Cir. 1988). When there is proof of an accident and an ensuing disability without any intervening cause, it is presumed that the accident caused the disability. Bertrand v. Coal Operators Casualty Company, 253 La. 1115, 221 So.2d 816 (1969); Adams. (Footnotes omitted.)
This court said in Dixon v. La. Restaurant Ass'n., 561 So.2d 135 (La.App. 3rd Cir.1990):
For a heart attack to arise out of or be causually related to the employment, the exertion, stress or strain, acting upon the pre-existing disease, must be of a degree greater than that generated in the employee's every day non-employment life. Carruthers v. PPG Industries, Inc., 551 So.2d 1282 (La.1989). The employment need not be the sole cause of the heart injury in order to satisfy the legal test "arising out of" employment, so long as it is shown to be a contributing, accelerating or aggravating factor. Reid v. Gamb, supra.
In Carruthers v. PPG Industries, Inc., 551 So.2d 1282 (La.1989), the Supreme Court ruled in the worker's favor in a heart attack case, reversing both the trial court and the appellate court. Carruthers climbed one flight of stairs to his second story office, to which he had been recently moved, sat down at his desk, and suffered a fatal heart attack within minutes of his arrival. The medical evidence was not conclusive. One doctor testified that Carruthers avoided stairs in his non-employment life and that climbing stairs at work imposed additional stress on him. Another physician would not give an opinion and still another cardiologist felt that climbing stairs was mild exertion and did not cause the attack. We regard the facts in the present case as much stronger for the plaintiff than in Carruthers.
Dr. Kaimal gave testimony that the plaintiff had reached maximum medical improvement by April 7, 1988. Therefore, she is entitled to an award of temporary total disability benefits from April 7, 1987, *427 through April 7, 1988. After the latter date she is entitled to supplemental earnings benefits.

PENALTIES AND ATTORNEYS FEES
The penalty provisions of La.R.S. 23:1201.2 are invoked if the action of the insurer or the employer is found to have been arbitrary, capricious, or without probable cause, either in making timely payment of benefits, or in discontinuing benefits. The purpose of the penalty provision of this statute is to discourage an attitude of indifference toward the injured employee. Alexander v. Dept. of Culture, Etc., 410 So.2d 1286 (La.App. 3rd Cir.1982).
In the present case the state terminated benefits on January 17, 1989. There is no factual or medical support in the record for that termination.
The only witness for the state was Paul Glen Badders, a risk claims adjustor for the state Office of Risk Management. His office was in Pineville. He handled this claim. Mr. Badders said that the decision to terminate benefits was made in Baton Rouge. He said that this decision was made by a claims council that consisted of three or four persons. There is nothing in the record indicating when this decision was made, on what information it was based, or why the decision was reached. Mr. Badders frankly testified that he did not forward the claim to Baton Rouge for review and that he did not make any recommendation. Thus, from the record, there is no explanation for the council's action. Because there was no explanation for the decision to terminate benefits, and no support for it in the record, this court has no alternative except to view the action of the state as being arbitrary and capricious. Penalties will be assessed. Attorney's fees are awarded, and fixed in the amount of $8,500.
For the foregoing reasons, judgment is rendered awarding plaintiff temporary total disability benefits at the rate of $205.34 per week from April 7, 1987, through April 7, 1988. Thereafter, plaintiff is entitled to supplemental earnings benefits in accordance with La.R.S. 23:1221(3) until such time as employment or self-employment is proven to be offered, tendered or available, together with all outstanding medical bills, and together with legal interest from due date of each weekly installment, until paid, subject to a credit for weekly worker's compensation benefits previously paid by the defendant. Judgment is further rendered awarding penalty interest on all amounts due from January 17, 1989, until paid, including any unpaid medical benefits. Finally, judgment is rendered awarding attorney's fees of $8,500, with legal interest from judicial demand. The defendant will pay all costs both here and below.
REVERSED AND RENDERED.